SYLLABUS

This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

### New Jersey Republican State Committee v. Philip D. Murphy
(A-82-19) (084731)

**Argued August 5, 2020 -- Decided August 12, 2020**

**RABNER, C.J., writing for the Court.**

This appeal addresses whether the State's plan to issue bonds and borrow funds from the federal government in response to the emergency caused by COVID-19, in an amount up to $9.9 billion, is constitutional.

To make up for the tax revenue shortfall COVID-19 has created and to maintain the State's fiscal integrity, the Legislature passed and the Governor signed into law a bill that authorizes the State to borrow up to $9.9 billion. Under the new law, the "New Jersey COVID-19 Emergency Bond Act" (Bond Act or Act), the State can issue bonds for private sale or borrow funds from the federal government. Up to $2.7 billion in borrowing can be used for the period from July 1, 2019 through September 30, 2020, and up to $7.2 billion for the period from October 1, 2020 through June 30, 2021.

The law represents a policy choice made by the Legislative and Executive Branches to address the current crisis. It is not for the Judiciary to assess the wisdom of that decision. The only question here is whether the borrowing scheme violates the State Constitution.

Basic principles about the State's fiscal affairs are set out in Article VIII, Section 2 of the Constitution. That section includes two key clauses that relate to the State's appropriations and creation of debt in any fiscal year.

The Appropriations Clause requires that "one general appropriation law covering one and the same fiscal year" be adopted. N.J. Const. art. VIII, § 2, ¶ 2. The Clause also calls for a balanced budget each year. Ibid. Under Lance v. McGreevey, proceeds from contract bonds cannot be counted as revenue in balancing the budget. 180 N.J. 590, 593 (2004).

The Debt Limitation Clause, as its name suggests, imposes limits on incurring debt. N.J. Const. art. VIII, § 2, ¶ 3. The Clause bars the State from creating debt that exceeds one percent of the total amount appropriated in the general appropriations law without voter approval. Id. ¶ 3(a). The Clause, however, provides an exception for any debts or liabilities created "to meet an emergency caused by disaster." Id. ¶ 3(e) (the "Emergency Exception").

The language of the Emergency Exception requires the Court to address (1) whether COVID-19 qualifies as a "disaster," and, if so, the nature of the emergency it has caused; (2) what type of borrowing "meet[s] an emergency caused by disaster"; and (3) the interplay between the Emergency Exception and the fiscal clauses of the Constitution.

Laypeople, scientists, and legal scholars alike would agree that COVID-19 is a true disaster with widespread consequences. The pandemic has caused a health emergency, a broad-based economic one that has devastated many individuals and families, and a fiscal crisis for the State. The present "emergency caused by disaster" extends to all three areas.

Second, the State is permitted to incur debt and borrow money "to meet" the emergency. At a minimum, any borrowing under the Act must relate to or provide for the pending emergency. The Court defers to the Legislature as to which programs will best respond to the pandemic, provided the choices do not run afoul of the Constitution. That said, not every act of borrowing would "meet" the emergency caused by the pandemic.

Further, the Bond Act uses only general language to state its purpose. It authorizes borrowing "to respond to the fiscal exigencies caused by the COVID-19 Pandemic and to maintain and preserve the fiscal integrity of the State." Bond Act, § 2(ll). The Act thus links permissible borrowing to the State's fiscal exigency -- the shortfall in revenue caused by the pandemic -- but does not specify particular types of relief. Whether borrowing meets the emergency therefore depends on what the fiscal exigency or revenue shortfall actually is.

The Legislature acted on the best information available when, on July 16, 2020, it adopted a law that called for up to $9.9 billion in borrowing. But those projections are likely to continue to change in the months ahead, as the State Treasurer acknowledges. To avoid borrowing in excess of what the law allows, and to be faithful to the Emergency Exception, the Court requires that the Governor or the Treasurer certify the State's projected revenue figures and the shortfall resulting from the pandemic before each tranche of borrowing.

The State may not borrow more than the amount certified, and not more than $9.9 billion in total. In other words, if, at the time the State seeks to borrow money or issue bonds, the Governor or the Treasurer certifies that the shortfall resulting from the pandemic is estimated to be $7 billion, the State cannot borrow more than that amount.

The Court reads the Emergency Exception in light of the purpose of the fiscal clauses of the Constitution, considered as a whole, and the Framers' intent, thus avoiding absurd outcomes that would, for example, allow the State to borrow funds to meet an emergency but not be able to spend them. The Court also gives meaning to the underlying purpose of the relevant clauses: to impose discipline on the State's fiscal practices and provide flexibility to respond to emergencies caused by disaster. The Court concludes that the Act is valid under the Debt Limitation Clause and that the Appropriations Clause does not bar the new law.

**HELD:** Subject to the limits imposed here by the Court, the Bond Act does not violate the Constitution.

**Section II** of the Court's opinion chronicles the human toll and economic consequences of the COVID-19 pandemic, as well as measures taken by the State in response to the crisis. (pp. 8-13) The Court then details the provisions of the Bond Act. (pp. 13-16) Before the Bond Act was enacted, the Office of Legal Services opined that the State could borrow, under the Emergency Exception, "for expenses directly addressing COVID-19" and "to replace certified, anticipated revenue" -- relating to FY2020 -- "that was never realized due to COVID-19," but not "to replace general revenue to support non-COVID-19 related spending in future budgets." (pp. 16-18) Plaintiffs filed a complaint on July 16, 2020, asserting that the Bond Act violated the Debt Limitation Clause, and the Court granted direct certification the next day, ___ N.J. ___ (2020), because the issues raised are critical to both the budget process and the public and because the matter needs to be resolved with finality before the end of the fiscal year on September 30, 2020. (pp. 18-19)

**Section III** summarizes the arguments raised by the parties. (pp. 19-21)

**Section IV** of the Court's opinion sets forth principles of constitutional interpretation, including the strong presumption of validity that attaches to legislation and the need to avoid interpretations that render language in the Constitution superfluous or meaningless, or that lead to absurd results. In the end, the polestar of constitutional construction is always the intent and purpose of the particular provision. (pp. 21-24)

**Section V** of the opinion traces the relevant constitutional history relating to appropriations and debt limits. That history reveals the extent to which the Framers of the 1947 Constitution were influenced by the recent experience of the Great Depression and the need for the State to be able to respond to emergencies. (pp. 24-37)

**Section VI** examines the current Appropriations Clause, which calls for the State's finances to be conducted on the basis of a single fiscal year covered by a single balanced budget. The Clause does not contain an emergency exception. The Court interpreted the Clause in Lance when it considered whether the State could "rely on borrowed funds to balance its annual budget." 180 N.J. at 593. The Lance Court held that proceeds from contract bonds "do not constitute 'revenue' for purposes of . . . the Appropriations Clause[], and cannot be used to balance the annual budget." Ibid. The Court in Lance declined to consider plaintiffs' challenge under the Debt Limitation Clause -- noting the question raised had been resolved in Lonegan v. State (Lonegan II), 176 N.J. 2 (2003) -- and had no other reason to consider that Clause or the Emergency Exception. See 180 N.J. at 593. (pp. 37-39)

**Section VII** studies the current Debt Limitation Clause, which, as relevant here, requires voter approval for the State to incur debts that together exceed one percent of the general appropriation for the fiscal year -- except for debts created "to meet an emergency caused by disaster." The Constitution does not define "emergency" or "disaster," and no case law has addressed the meaning of the Emergency Exception or its interplay with the Appropriations Clause. In Lonegan II, the Court held that "only debt that is legally enforceable against the State is subject to the Debt Limitation Clause." 176 N.J. at 13. Because contract bonds are not backed by the full faith and credit of the State and are subject

3

to future legislative appropriations, they are not legally enforceable against the State and, as a result, do not violate the Debt Limitation Clause.  Id. at 14-15, 21.  Lonegan II did not address possible tensions between the Appropriations and Debt Limitation Clauses.  (pp. 39-43)

**Section VIII** addresses several issues that the Bond Act presents:  (1) whether COVID-19 qualifies as a "disaster," and, if so, the nature of the emergency it has caused; (2) what type of borrowing "meet[s] an emergency caused by disaster"; and (3) the interplay between the Emergency Exception and the fiscal clauses of the Constitution.  (pp. 43-56)

(1)  Here, the parties agree that the COVID-19 pandemic is a disaster within the meaning of the exception.  Whatever else the Emergency Exception may encompass, it includes a rare, once-in-a-century, infectious disease of the magnitude of COVID-19, which has caused a health emergency, a broad-based economic one that has left individuals and families struggling, and a fiscal crisis for the State.  The nature of the "emergency" extends to all three.  Any debate over whether the disaster and its effects are foreseen or unforeseen at this point misses the mark.  The distinction does not appear in the text of the Emergency Exception and is illogical when it comes to a continuing emergency.  (pp. 44-46)

(2)  The second component of the Emergency Exception -- that borrowing must "meet an emergency" -- begs the question as to what type of borrowing is permitted.  The Court considers the definition of "meet" and discerns that, at a minimum, incurring debt to meet an emergency caused by disaster means that borrowing must relate to or provide for that emergency.  The Bond Act authorizes borrowing "[1] to respond to the fiscal exigencies caused by the COVID-19 Pandemic and [2] to maintain and preserve the fiscal integrity of the State."  Bond Act, § 2(ll).  The Court does not read those phrases as separate, stand-alone justifications for borrowing under the Emergency Exception.  If borrowing were done solely to maintain the State's fiscal integrity, untethered to the effects of the pandemic, it would not satisfy the exception.  Both clauses must relate to the effects of COVID-19.  In this case, borrowing "to meet an emergency" raises two issues:  the type of borrowing and spending, and the overall amount of borrowing.  (pp. 46-47)

Here, borrowing may be allowed to meet all three aspects of the current emergency.  Debt can be incurred to provide not only for masks, respirators, and field hospitals, and for direct aid to individuals and families afflicted by the disease, but also for the impact on the public fisc caused by COVID-19.  For example, the State may borrow to provide for public services like education, police, fire, first aid, child welfare, and prisons -- to secure the continued functioning of government.  In other words, because the collapse in revenue brought on by the pandemic affects the State's ability to provide for direct aid and other government services, the Emergency Exception permits the State to borrow in order to meet them.  But not every act of borrowing would "meet" the current emergency.  Borrowing for programs unrelated to the emergency, such as the subsidization of a new sports arena, would not satisfy the language of the exception or the Act.  To incur debt for such a project would require additional legislation that might well need voter approval.  The above examples are

illustrative only.  Questions about which projects best respond to the pandemic are for the Legislature and the people to decide, subject only to constitutional bounds.  (pp. 47-50)

Because of how the Bond Act was drafted, this case presents an additional issue: whether the overall amount of borrowing meets the current emergency.  The Act caps the total amount of borrowing at $9.9 billion.  That amount matches the projected revenue shortfall the State Treasurer reported on May 22, 2020 -- an estimate that has been reduced and is expected to continue to fluctuate.  To avoid borrowing in excess of what the law allows, and to be faithful to the Emergency Exception, the State cannot issue bonds or borrow funds beyond the actual fiscal exigency caused by the pandemic.  In order to satisfy those concerns, it will be necessary for the Governor or the Treasurer to certify publicly the State's projected revenue and consequent shortfall "as a result of the COVID-19 pandemic" before each tranche of borrowing.  What this means in practice is that, even though the Bond Act allows for borrowing of up to $9.9 billion, if the Governor or the Treasurer were to certify that the fiscal shortfall due to COVID-19 was $7 billion, then the State could borrow only up to that amount at the time.  (pp. 50-52)

The Bond Act's generic language, which is linked to the State's fiscal shortfall, calls for this added level of protection.  Had the Act instead specified particular efforts to meet the emergency, there would be no need for the additional periodic certifications that the Court requires.  The Court encourages greater specificity for laws issued under the Emergency Exception and for how borrowed money will be spent.  (pp. 52-53)

(3)  Applying the principles of constitutional interpretation noted above, the Court concludes that the Appropriations Clause does not stand in the way of borrowing for appropriate purposes under the Emergency Exception.  A contrary reading would lead to a situation in which the State could borrow funds to meet an emergency but not be able to spend them.  And the history of the 1947 Constitutional Convention revealed the Framers had dual concerns:  to impose discipline on the State's fiscal practices and, at the same time, provide flexibility to respond to emergencies caused by disaster.  Read in tandem, and in light of the Framers' intent, the fiscal clauses allow the State to borrow and spend for that particular purpose and do not pose a bar to the Bond Act.  The Court notes that its decision does not overrule the holding in Lance, which did not consider the Debt Limitation Clause, the Emergency Exception, or their interplay with the Appropriations Clause.  (pp. 53-56)

**Section IX** concludes that the Bond Act is constitutional, subject to the limiting principles set forth in the opinion.  (pp. 56-57)

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in CHIEF JUSTICE RABNER's opinion.**

# SUPREME COURT OF NEW JERSEY

## A-82 September Term 2019

## 084731

New Jersey Republican State
Committee a/k/a the NJGOP;
Declan O'Scanlon; Hal Wirths;
Lisa Natale-Contessa; and
Ileana Schirmer,

Plaintiffs,

v.

Philip D. Murphy, in his
official capacity as
Governor of New Jersey,

Defendant.

On direct certification by the Supreme Court from
the Superior Court,
Law Division, Mercer County.

| Argued | Decided |
|---|---|
| August 5, 2020 | August 12, 2020 |

Michael L. Testa, Jr., argued the cause for plaintiffs
(Testa Heck Testa & White, attorneys; Michael L. Testa,
Jr., Justin R. White, and Anthony M. Imbesi, of counsel
and on the briefs, and Mark D. Sheridan, Jason F. King,
and James K. Webber, Jr. (Squire Patton Boggs and
Webber McGill), on the reply brief).

Jean P. Reilly, Assistant Attorney General, argued the
cause for defendant (Gurbir S. Grewal, Attorney General,
attorney; Jean P. Reilly, of counsel and on the briefs, and

1

Jamie M. Zug, Eric L. Apar, Eileen W. Siegeltuch, Victoria G. Nilsson, and Susan J. Wilkerson, Deputy Attorneys General, on the briefs).

Mark D. Sheridan argued the cause for amici curiae Jack M. Ciattarelli and Assemblyman James K. Webber, Jr. (Squire Patton Boggs and Webber McGill, attorneys; Mark D. Sheridan, Jason F. King, and James K. Webber, Jr., of counsel and on the brief).

Seth Grossman submitted a brief on behalf of amici curiae Liberty and Prosperity 1776, Inc., and Michael E. Smith.

CHIEF JUSTICE RABNER delivered the opinion of the Court.

This appeal addresses whether the State's plan to issue bonds and borrow funds from the federal government in response to the emergency caused by COVID-19, in an amount up to $9.9 billion, is constitutional. Because the issue is vitally important and must be resolved quickly, we directly certified the matter for the Court's prompt review.

## I. Introduction

The impact of the COVID-19 pandemic has been felt in many ways. The human toll is staggering. Millions worldwide have contracted the virus, and hundreds of thousands have passed away from it. Our nation and State have been particularly hard hit by the pandemic. New Jersey has the second highest number of COVID-19 deaths in the nation, and the eighth highest number of

2

cases.  Altogether, up until now, more than 185,000 New Jerseyans have fallen ill from the virus, and an estimated 15,800 have died.

The economic fallout has been enormous as well.  In a matter of months, countless businesses have shuttered and millions of people have lost their jobs, resulting in immense personal and professional hardships.  About 1.4 million New Jersey residents filed for unemployment benefits from mid-March to mid-July.

Tax revenues have also plummeted.  Unlike in the federal system, our State Constitution requires the Governor and Legislature to adopt a balanced budget every year.  See N.J. Const. art. VIII, § 2, ¶ 2.  To make up for the shortfall COVID-19 has created and to maintain the State's fiscal integrity, the Legislature passed and the Governor signed into law a bill that authorizes the State to borrow up to $9.9 billion.  Under the new law, the "New Jersey COVID-19 Emergency Bond Act" (Bond Act or Act), the State can issue bonds for private sale or borrow funds from the federal government.  Up to $2.7 billion in borrowing can be used for the period from July 1, 2019 through September 30, 2020, and up to $7.2 billion for the period from October 1, 2020 through June 30, 2021.

The law represents a policy choice made by the Legislative and Executive Branches to address the current crisis.  It is not for the Judiciary to

3

assess the wisdom of that decision. The only question before the Court is whether the borrowing scheme violates the New Jersey Constitution.

Basic principles about the State's fiscal affairs are set out in Article VIII, Section 2 of the Constitution. That section includes two key clauses that relate to the State's appropriations and creation of debt in any fiscal year.

The Appropriations Clause requires that "one general appropriation law covering one and the same fiscal year" be adopted. N.J. Const. art. VIII, § 2, ¶ 2. The Clause also calls for a balanced budget each year. Ibid. Under Lance v. McGreevey, proceeds from contract bonds cannot be counted as revenue in balancing the budget. 180 N.J. 590, 593 (2004).

The Debt Limitation Clause, as its name suggests, imposes limits on incurring debt. N.J. Const. art. VIII, § 2, ¶ 3. The Clause bars the State from creating debt that exceeds one percent of the total amount appropriated in the general appropriations law without voter approval. Id. ¶ 3(a). The Clause, however, provides an exception for any debts or liabilities created "to meet an emergency caused by disaster." Id. ¶ 3(e). For short, we refer to that language as the "Emergency Exception." It is central to the outcome of this case.

Like so much else brought on by COVID-19, the legal issue before the Court is unprecedented. The above passage first appeared in the Constitution of 1947 and has not previously been considered by the courts. As discussed in

4

more detail below, the record of the 1947 Constitutional Convention reveals how the nation's recent experience with the Great Depression influenced the Convention -- and, in particular, the Framers' decision to amend the Constitution to allow for greater flexibility to respond to emergencies.

The language of the Emergency Exception requires us to address several issues: (1) whether COVID-19 qualifies as a "disaster," and, if so, the nature of the emergency it has caused; (2) what type of borrowing "meet[s] an emergency caused by disaster"; and (3) the interplay between the Emergency Exception and the fiscal clauses of the Constitution.

The first issue is straightforward. Laypeople, scientists, and legal scholars alike would agree that COVID-19 is a true disaster with widespread consequences. The pandemic has caused a health emergency, a broad-based economic one that has devastated many individuals and families, and a fiscal crisis for the State. The present "emergency caused by disaster" extends to all three areas.

Second, the State is permitted to incur debt and borrow money "to meet" the emergency. At a minimum, any borrowing under the Act must relate to or provide for the pending emergency. We defer to the Legislature as to which programs will best respond to the pandemic, provided the choices do not run

afoul of the Constitution. That said, not every act of borrowing would "meet" the emergency caused by the pandemic, as noted below.

Further, the Bond Act uses only general language to state its purpose. The law authorizes borrowing "to respond to the fiscal exigencies caused by the COVID-19 Pandemic and to maintain and preserve the fiscal integrity of the State." Bond Act, § 2(ll). The Act thus links permissible borrowing to the State's fiscal exigency -- the shortfall in revenue caused by the pandemic -- but does not specify particular types of relief efforts or programs. Whether borrowing meets the emergency therefore depends on what the fiscal exigency or revenue shortfall actually is.

The Legislature acted on the best information available to it when, on July 16, 2020, it adopted a law that called for up to $9.9 billion in borrowing. The amount reflected current projections around that time. But those projections are likely to continue to change in the weeks and months ahead, as the State Treasurer acknowledges. To avoid borrowing in excess of what the law allows, and to be faithful to the Emergency Exception, we require that the Governor or the Treasurer certify the State's projected revenue figures and the shortfall resulting from the COVID-19 pandemic before each tranche of borrowing.

6

The State may not borrow more than the amount certified, and not more than $9.9 billion in total. In other words, if, at the time the State seeks to borrow money or issue bonds, the Governor or the Treasurer certifies that the shortfall resulting from the pandemic is estimated to be $7 billion, the State cannot borrow more than that amount.

Finally, we read the Emergency Exception in light of the purpose of the fiscal clauses of the Constitution, considered as a whole, and the Framers' intent. By doing so, we avoid absurd outcomes that would, for example, allow the State to borrow funds to meet an emergency but not be able to spend them. We also give meaning to the underlying purpose of the relevant clauses: to impose discipline on the State's fiscal practices and provide flexibility to respond to emergencies caused by disaster.

We therefore conclude that the Act is valid under the Debt Limitation Clause and that the Appropriations Clause does not bar the new law. Subject to certain limits we impose, the Bond Act does not violate the Constitution.

## II. Facts and Procedural History

### A.

COVID-19 is a contagious disease caused by a new type of coronavirus.[1] The virus, first identified in an outbreak in Wuhan, China in December 2019, has since spread around the globe. The Governor declared a public health emergency and state of emergency on March 9, 2020. The World Health Organization declared the outbreak a pandemic on March 11, 2020. The President proclaimed the pandemic a national emergency on March 13, 2020. At this time, there is no vaccine or cure for the virus.

COVID-19 has taken an enormous toll. There are more than 20.1 million confirmed cases worldwide and more than 5.1 million in the United States.[2] 737,520 people have lost their lives -- 163,681 of them in the United States. New Jersey has been hit particularly hard, with 185,031 confirmed

---

[1] World Health Org., "Q&A on coronaviruses (COVID-19)" (Apr. 17, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses.

[2] Except where otherwise noted, the data in this paragraph comes from the Johns Hopkins University of Medicine, Coronavirus Resource Center, and is current as of August 11, 2020. The data can be found at https://coronavirus.jhu.edu/.

cases and 15,878 deaths. Our State ranks second in the nation in COVID-19 deaths and eighth in the number of cases.[3]

The virus has also triggered staggering economic consequences for the nation and the State. As states and cities imposed restrictions to slow the spread of the virus, business closures led to mass layoffs and furloughs. Gross Domestic Product fell 32.9% on an annualized basis during the second quarter of this year, marking one of the steepest declines in the country's history.[4] The nation's unemployment rate rose from 3.5% in February 2020 to 14.7% in mid-April.[5] In May, the number of people seeking unemployment benefits peaked at nearly 25 million nationwide.[6] By June, New Jersey's

---

[3] CDC COVID Data Tracker, "United States COVID-19 Cases and Deaths by State," https://www.cdc.gov/covid-data-tracker/#cases (last visited Aug. 11, 2020).

[4] Ben Casselman, "A Collapse That Wiped Out 5 Years of Growth, With No Bounce in Sight," N.Y. Times (July 30, 2020); Fed. Reserve Bank of St. Louis, "Real Gross Domestic Product," https://fred.stlouisfed.org/series/GDPC1#0.

[5] Fed. Reserve Bank of St. Louis, "Unemployment Rate," https://fred.stlouisfed.org/series/UNRATE (compiling data from the U.S. Bureau of Labor Statistics).

[6] Id., "Continued Claims," https://fred.stlouisfed.org/series/CCSA.

unemployment rate had reached 16.6%.[7]  Nearly 1.4 million New Jersey

residents filed unemployment claims between mid-March and mid-July.[8]  Even

as workers returned to their jobs, the number of continuing claims remained

close to 500,000 in mid-July.[9]

In response to the crisis, Governor Philip D. Murphy issued a series of

Executive Orders, including stay-at-home orders and directives that closed

non-essential retail businesses.[10]  On April 14, 2020, the State enacted the

COVID-19 Fiscal Mitigation Act, which extended Fiscal Year 2020 (FY2020)

through September 30, 2020,[11] and required the State Treasurer to prepare a

---

[7]  Dep't of Labor & Workforce Dev., Press Release:  "Challenges Remain as New Jersey Employment Continues Rebound in June," (July 16, 2020), https://nj.gov/labor/lpa/pub/emppress/pressrelease/prelease.pdf.

[8]  Id., Press Release:  "NJ Labor Dept. Has Distributed $10.7B in Unemployment Benefits Since Start of Pandemic" (July 16, 2020), https://www.nj.gov/labor/lwdhome/press/2020/20200716_paymentsupdate.shtml.

[9]  Certification of Lesley Hirsch, ¶ 17 (July 31, 2020).

[10]  See, e.g., Exec. Order No. 104 (EO 104) (Mar. 16, 2020) and EO 107 (Mar. 21, 2020).

[11]  L. 2020, c. 19, § 3.  The fiscal year traditionally runs from July 1 to June 30.  In ordinary times, "FY2020," for example, would run from July 1, 2019 through June 30, 2020.  At the outset of the fiscal year, Governors certify the amount of revenue from taxes, fees, and other sources, which they reasonably anticipate will be available to spend, consistent with the Appropriations Clause.

report on the State's financial condition for FY2020 and FY2021.[12] The report, submitted on May 22, 2020, states that New Jersey potentially faces "a combined revenue shortfall of nearly $10 billion" for the remaining months of FY2020 and through the end of FY2021.[13] The report projected that budget revenues will be $2.7 billion lower than previously forecast for FY2020, and $7.2 billion lower for FY2021.[14]

By June, the estimates improved slightly to a $2.3 billion shortfall for FY2020 and a $6.9 billion shortfall for FY2021.[15] Revenue trends through July suggested higher overall revenue than predicted on May 22 and June 30.[16] The State Treasurer also noted that "the revenue forecast will most certainly change in the coming weeks and months as actual collections data are tabulated and as state specific economic impacts of the pandemic begin to

---

[12] L. 2020, c. 19, § 5. The shortened FY2021 will begin on October 1, 2020 and end on June 30, 2021. Id. § 3(a).

[13] Dep't of the Treasury, Report on the Financial Condition of the State Budget for Fiscal Years 2020 and 2021 2 (May 22, 2020).

[14] Id. at 8.

[15] Certification of Elizabeth Maher Muoio ¶ 65 (July 31, 2020).

[16] Id. ¶ 66.

11

crystalize."[17] At the same time, the Treasurer testified before the Legislature that the demand for public services has "increased significantly" -- referencing "[d]emand for and reliance on public health professionals, law enforcement, first responders, financial assistance, and Medicaid, just to name a few."[18]

To balance the budget for the extended FY2020, the State enacted a Supplemental Appropriations Act on June 30, 2020, which deferred and cut billions in spending.[19] The original State budget for FY2020 appropriated $38.7 billion in state funds.[20] As of the end of March 2020, the State had already spent approximately $30 billion.[21] In the Governor's budget message delivered on February 25, 2020, he estimated $41.1 billion in revenues for the upcoming FY2021 budget.[22] The budget message preceded the now widely known COVID-19 pandemic.

---

[17] Id. ¶ 59.

[18] Id. Ex. C.

[19] L. 2020, c. 43.

[20] L. 2019, c. 150.

[21] Muoio Cert. ¶ 77.

[22] Office of Mgmt. & Budget, The Governor's FY2021 Budget at B-2, B-3 (March 2020).

In an effort to stabilize the economy in April and May 2020, the federal government made available up to $500 billion for states and local governments to borrow.  New Jersey is eligible to borrow up to $9.2 billion of that amount.[23]  Any borrowing must be backed by the State's "strongest security typically pledged to repay publicly offered obligations" and must be repaid within three years.[24]

B.

In response to the effects of the pandemic, on July 16, 2020, the Legislature passed and the Governor signed into law the New Jersey COVID-19 Emergency Bond Act.  L. 2020, c. 60.  The law authorizes the State to borrow up to $9.9 billion.

The Act identifies the "severe impact" COVID-19 has had on the State's economy:  (1) "expect[ed] precipitous declines in revenue" in FY2020 and FY2021, including "significant reductions" in revenues from gross income taxes, corporate business taxes, sales and use taxes, motor fuels taxes, casino-related taxes, and lottery sales, id. § 2(hh), 2(ii)(1); (2) the "need to significantly revise the estimated revenues and projected appropriations for

---

[23]  Certification of Michael B. Kanef ¶¶ 51-56 (July 31, 2020) (describing Municipal Liquidity Facility).

[24]  Id. ¶¶ 57, 74.

Fiscal Years 2020 and 2021," id. § 2(ii)(2); and (3) potential increases in "the actuarially recommended contributions to the State's pension plans to the extent that the valuation of pension plans is affected by the deterioration in value in the investment markets," id. § 2(ii)(3).

"[T]o respond to the fiscal exigencies caused by the COVID-19 Pandemic and to maintain and preserve the fiscal integrity of the State" -- the law's stated purpose -- the Act authorizes the State to issue bonds and borrow from the federal government.  Id. § 2(ll); see also id. § 4(a).  Bonds may be sold to the federal government and at any public or private sale for a total amount of up to $9.9 billion.  Id. § 4(a).  The State may issue up to $2.7 billion in bonds for the three-month period that ends on September 30, 2020, and up to $7.2 billion for the upcoming shortened FY2021.  Ibid.  The Act also provides for the State to issue "[r]efunding bonds" in order to refund bonds that were previously issued and pay "the principal of the outstanding bonds." Id. § 4(b).

The Act establishes a Select Commission on Emergency COVID-19 Borrowing.  Id. § 6.  The Commission is comprised of two Senators selected by the Senate President and two members of the Assembly selected by the Speaker.  Ibid.

14

According to the Act, the process for borrowing is as follows. The Governor, State Treasurer, and Director of the Division of Budget & Accounting within the Department of the Treasury, or any two of them -- referred to as the "issuing officials" -- make an initial decision to issue bonds. Ibid. They then transmit a report that describes the proposed bonds to the Select Commission, which must vote on the proposal within six days. Ibid. Approval by three members is required before the State can issue any bonds. The Commission's failure to meet, act, or approve the report constitutes disapproval. Ibid.

Proceeds from the sale of bonds are to be deposited by the State Treasurer in a separate fund -- the "New Jersey COVID-19 State Emergency Fund." Id. § 13. The Act directs the Treasurer to transfer those proceeds to "the General Fund or the Property Tax Relief Fund as needed to support appropriations made by the Legislature" for FY2021. Id. § 14. According to the Act, "such amounts shall constitute State revenues." Ibid. The balance in the Emergency Fund is subject to appropriation by the Legislature. Ibid.

All bonds issued under the Act are a "direct obligation of the State" and are backed by its "faith and credit." Id. § 7. The State is thus obligated to make interest payments and redeem the principal amount of the bonds when they mature -- no later than thirty-five years after the date they were issued.

15

Id. §§ 5, 7.  To provide funds to repay the principal and interest, the Act appropriates, or pledges, taxes collected under the Sales and Use Tax Act, N.J.S.A. 54:32B-1 to -55.  Id. § 22(a).  If necessary, the State is authorized to levy and collect an annual tax on real and personal property in each municipality.  Id. § 22(b).  If, however, there is money in the General Fund at the end of the calendar year that is "beyond the needs of the State," the Treasurer is directed to transfer those funds for the payment of principal and interest on the bonds.  Ibid.

## C.

Before the Bond Act was enacted, the Assembly Minority Leader asked the Office of Legislative Services (OLS) to offer an opinion on "whether or not the State may issue general obligation bonds without voter approval to meet the needs of the State arising from the COVID-19 pandemic."

OLS issued an opinion letter on May 7, 2020.  In it, OLS opined "that the COVID-19 pandemic is a disaster contemplated by the [Emergency Exception], and the State therefore may issue bonds, without the usual requirement for voter approval, to meet COVID-19 related emergency needs." The opinion letter, however, drew a distinction between "borrowing to supplement revenue for future fiscal year budgets," which OLS believed would violate the Constitution, and "borrowing money where the anticipated revenue

16

certified in accordance with . . . the Constitution becomes insufficient due to an unexpected event" -- a reference to FY2020 -- which OLS found permissible.

OLS noted that "the Constitution does not define 'emergency' or the meaning of 'to meet an emergency.'" Examining the language in the context of the entire Emergency Exception, OLS opined that "'to meet an emergency' appears to be limited to borrowing to directly resolve the presently identifiable emergency," such as the purchase of "ventilators and personal protective equipment."

OLS also concluded that "the sudden, unanticipated and precipitous shortfall of expected revenue resulting from the COVID-19 pandemic is the type of emergency contemplated by" the Emergency Exception. According to OLS, the State could therefore borrow "for expenses directly addressing COVID-19" and "to replace certified, anticipated revenue" -- relating to FY2020 -- "that was never realized due to COVID-19." The Emergency Exception, OLS opined, permitted "the State to address a specific, unforeseen spending need that arises" after the enactment of a budget that certified anticipated revenues.

In OLS's view, the Emergency Exception "do[es] not provide an exemption to the balanced budget requirement[]." As to the FY2021 budget,

17

OLS observed that the decline in revenue "will not be a precipitous and unforeseen shortfall, but rather an anticipated decline." Borrowing to supplement that shortfall, OLS opined, would be inconsistent with the constitutional requirement of a balanced budget. In short, OLS stated that "borrowed money may not be used to replace general revenue to support non-COVID-19 related spending in future budgets."

D.

In anticipation of the Governor signing the Act, plaintiffs -- the New Jersey Republican State Committee, Declan O'Scanlon, Hal Wirths, Lisa Natale-Contessa, and Ileana Schirmer -- filed a complaint on July 16, 2020. The complaint asserted the legislation violated the Debt Limitation Clause of the State Constitution and accordingly sought to restrain the Governor from signing or enforcing the bill, S. 2697/A. 4175. The following day, plaintiffs filed an amended complaint that acknowledged the Governor had enacted the legislation. Plaintiffs sought declaratory and injunctive relief on the same grounds.

We granted direct certification on July 17, 2020. ___ N.J. ___ (2020); see also R. 2:12-1, -4. We acted because the issues raised are critical to both the budget process and the public at this challenging time in our State's history. We also recognized that the matter needed to be resolved with finality

18

before the end of the fiscal year on September 30, 2020, which is fast approaching.

We denied a motion by Jack M. Ciattarelli and James K. Webber, Jr. to intervene but granted their alternative request to participate as amici curiae. We also granted leave to Liberty and Prosperity 1776, Inc. and Michael Smith to participate as amici.

### III.  Parties' Arguments

Plaintiffs argue that the Bond Act is unconstitutional because it violates both the Appropriations Clause and the Debt Limitation Clause.  They contend the Act seeks to fund general operating expenses of the State with proceeds from bonds, contrary to the ruling in Lance.  Because debt financing cannot be considered revenue or counted toward a balanced budget, plaintiffs argue, the Act violates the Appropriations Clause.  Plaintiffs also submit the Act is unconstitutional under the Debt Limitation Clause because the debt it authorizes is not limited to a single object.

In addition, plaintiffs assert that the Emergency Exception "does not obviate the Appropriations Clause."  According to plaintiffs, the emergency that struck New Jersey in the first quarter of 2020 during FY2020 -- the COVID-19 pandemic -- "is no longer a surprise or unforeseen."  An

19

anticipated decline in tax collection and income, plaintiffs submit, "is not an 'emergency' that allows circumventing the Appropriations Clause."

Amici Ciattarelli and Webber likewise contend the Bond Act violates the Appropriations Clause and the Debt Limitation Clause. They claim the Act is a "direct assault on the holding" in Lance and thus runs afoul of the Appropriations Clause. In addition, they argue the Act fails to satisfy the Emergency Exception because it permits borrowing to recreate lost revenue, not to meet an emergency. Read together, amici maintain, the Appropriations Clause and the Debt Limitation Clause prohibit debt financing of general expenses. Amici add that the Act is bad public policy that threatens the public fisc.

Amici Liberty and Prosperity 1776 and Michael Smith also argue the Act is unconstitutional and stress the importance of voter approval under the Constitution. They further contend there is no objective evidence the State must spend $9.9 billion to meet an emergency.

The State urges that the Bond Act be upheld. It contends that the emergency and federal funds exceptions to the Debt Limitation Clause permit the government to create debt to meet the current fiscal emergency. The State also maintains that proceeds from bonds can be used to replace revenue and fund operating expenses across multiple fiscal years. It submits that

20

longstanding practice confirms such a reading of the Debt Limitation and Appropriations Clauses. The State also draws on the Framers' intent in 1947, with the Great Depression in mind, to provide flexible tools to respond to fiscal emergencies.

According to the State, <u>Lance</u> does not call for a different result. Any ambiguity relating to the fiscal clauses, the State adds, should be resolved in favor of the more specific language of the Debt Limitation Clause. In the alternative, the State submits that if the Court finds the Bond Act is unconstitutional, it should exercise its equitable powers to fashion a remedy for the present fiscal emergency.

## IV. <u>Interpretative Principles</u>

Statutes challenged on constitutional grounds are entitled to a strong presumption of validity. <u>State v. Buckner</u>, 223 N.J. 1, 14 (2015); <u>State v. Trump Hotels & Casino Resorts, Inc.</u>, 160 N.J. 505, 526 (1999); <u>Hamilton Amusement Ctr. v. Verniero</u>, 156 N.J. 254, 285 (1998). A law can be declared void only if its "<u>repugnancy</u> to the constitution is <u>clear beyond reasonable doubt</u>." <u>Buckner</u>, 223 N.J. at 14 (quoting <u>Gangemi v. Berry</u>, 25 N.J. 1, 10 (1957)).

The Judiciary "has the obligation and the ultimate responsibility to interpret the meaning of the Constitution." <u>State v. Lunsford</u>, 226 N.J. 129,

21

153 (2016). When called on to do so, courts must apply the provisions of the constitution in a way "that serves to effectuate fully and fairly [their] overriding purpose." Trump Hotels, 160 N.J. at 527 (emphasis added) (citation and quotation marks omitted); see also Lance, 180 N.J. at 596.

To assess the constitutionality of a statute, courts are "guided by the language and history of the New Jersey Constitution." Lunsford, 226 N.J. at 153. Judges consider "the text and structure of the Constitution, the relevant historical materials, and, most importantly, the 'basic principles of our democratic system.'" Comm. to Recall Robert Menendez From the Office of U.S. Senator v. Wells, 204 N.J. 79, 123 (2010) (interpreting the Federal Constitution and quoting U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 806 (1995)).

We look first to the plain language of a constitutional provision to understand its meaning and the Framers' intent. Buckner, 223 N.J. at 15. In doing so, courts give words their normal and ordinary meaning. Vreeland v. Byrne, 72 N.J. 292, 302 (1977). Absent "a clear indication to the contrary," when a word or phrase appears more than once, "it should have the same meaning throughout." L.A. v. DYFS, 217 N.J. 311, 333 (2014) (interpreting a statute and quoting Oldfield v. N.J. Realty Co., 1 N.J. 63, 69 (1948)). Beyond that, "resort may be had to pertinent constitutional and legislative history" to

help determine "the true sense and meaning of the language used." Atl. City Racing Ass'n v. Attorney Gen., 98 N.J. 535, 542 (1985).

Courts avoid interpretations that render language in the Constitution superfluous or meaningless. Burgos v. State, 222 N.J. 175, 203 (2015); State in Interest of K.P., 311 N.J. Super. 123, 139 (Ch. Div. 1997). Indeed, "when interpreting a constitution, 'real effect should be given to all the words it uses.'" State Conference-NAACP v. Harvey, 381 N.J. Super. 155, 159 (App. Div. 2005) (quoting Myers v. United States, 272 U.S. 52, 151 (1926)).

Courts must also avoid interpretations that lead to absurd results. See Sun Life Assurance Co. of Can. v. Wells Fargo Bank, N.A., 238 N.J. 157, 174 n.3 (2019) ("Statutes cannot 'be construed to lead to absurd results. All rules of construction are subordinate to that obvious proposition.'" (quoting State v. Provenzano, 34 N.J. 318, 322 (1961))); Perez v. Zagami, LLC, 218 N.J. 202, 214 (2014) (same). "[W]hen 'a literal interpretation would create a manifestly absurd result . . . ,' courts may consider [a] law's overall purpose for direction." Sussex Commons Assocs., LLC v. Rutgers, 210 N.J. 531, 541 (2012) (quoting Hubbard ex rel. Hubbard v. Reed, 168 N.J. 387, 392 (2001)).[25]

---

[25] "When confronted with words whose literal application would cause absurd, anomalous or otherwise inconceivable results, courts must always be prepared to ask whether the 'instant case involves a situation which apparently escaped the attention of the draftsman.'" First Nat'l Bank of Chicago v. Bridgeton

23

Those principles apply with equal force to the interpretation of both statutory language and the text of the Constitution.

In the end, "[t]he polestar of constitutional construction is always the intent and purpose of the particular provision." State v. Apportionment Comm'n, 125 N.J. 375, 382 (1991). In this case, with two relevant provisions, "[t]he true rule of construction 'is not to consider one provision of the Constitution alone, but to contemplate all,'" in order to give effect to the purpose of the Constitution as a whole. Behnke v. N.J. Highway Auth., 13 N.J. 14, 26 (1953) (quoting Downes v. Bidwell, 182 U.S. 244, 312 (1901)).

## V. History

To fully understand the fiscal framework of the modern Constitution and the interplay between the current Appropriations and Debt Limitation Clauses, we first trace the relevant constitutional history relating to appropriations and debt limits. That history reveals the extent to which the Framers of the 1947 Constitution were influenced by the recent experience of the Great Depression and the need for the State to be able to respond to emergencies.

---

Mun. Port Auth., 338 N.J. Super. 324, 327 (App. Div. 2001) (quoting Dvorkin v. Township of Dover, 29 N.J. 303, 313 (1959) (involving statutory interpretation)).

24

A.

The fiscal clauses first appeared in the 1844 Constitution. The threadbare Appropriations Clause of Article IV, Section 6, Paragraph 2 of the 1844 Constitution did not require a single, balanced budget. It merely provided that "[n]o money shall be drawn from the treasury but for appropriations made by law." N.J. Const. of 1844 art. IV, § 6, ¶ 2. The clause did not attract much attention or debate. See Proceedings of the New Jersey State Constitutional Convention of 1844 (1844 Proceedings) 114, 519 (1942) (presenting the proposed clause and noting it was "agreed to, without amendment").

The longer Debt Limitation Clause garnered significantly more attention. "As in most states, New Jersey's Debt Limitation Clause had its origins in the depression years that followed the economic boom of the 1830s." Lonegan v. State (Lonegan I), 174 N.J. 435, 443 (2002).

> Early in the 19th Century many of the states borrowed for the development of highways, canals and other internal improvements. Business boomed, money was plentiful, and the states had little difficulty in selling their bonds. By 1840 the bonded indebtedness of the states exceeded the then tidy sum of $200,000,000. However, with the aftermaths of the financial crisis of 1837, the borrowing states found themselves in difficulties and many states defaulted on their bond obligations.
>
> [Clayton v. Kervick, 52 N.J. 138, 146-47 (1968).]

25

"New Jersey was not caught 'so badly as were some of the other states' in the national 'speculative boom in internal improvements, in new business, . . . and in land operations' in the '20's and early '30's." John Bebout, "Introduction" to 1844 Proceedings, at xciv (quoting Eugene E. Agger, "Banking in New Jersey," in 4 New Jersey, A History 1213-14, 1223 (Irving S. Kull, ed., 1930)). Nevertheless, it is clear that "the delegates to the 1844 Constitutional Convention had in mind liability such as State bond indebtedness." Clayton, 52 N.J. at 147. Indeed, "[t]he history of the times renders evident the purpose of the 1844 provision." Id. at 146.

When Rhode Island adopted its first state constitution in 1842, it included the nation's first limitation on state debt. See Amos Tilton, "Constitutional Limitations on the Creation of State Debt," in 2 Proceedings of the Constitutional Convention of 1947 (1947 Proceedings) 1708, 1709 (1951). The Rhode Island clause provided that

> [t]he general assembly shall have no power, hereafter, without the express consent of the people, to incur state debts to an amount exceeding fifty thousand dollars, except in time of war, or in case of insurrection or invasion; nor shall they in any case, without such consent, pledge the faith of the state for the payment of the obligations of others. This section shall not be construed to refer to any money that may be deposited with this state by the government of the United States.
>
> [R.I. Const. of 1842 art. IV, § 13 (emphasis added).]

26

Two years later in New Jersey, the Committee on the Legislative Department presented a draft debt limitation provision for the New Jersey Constitution. See 1844 Proceedings at 111-15. Section Nineteen of the draft permitted double the amount of debt ($100,000); supplied greater detail as to how debt would be calculated, spent, obtained, and repaid; and included the exception contained in the Rhode Island provision "for purposes of war, or to repel invasion, or to suppress insurrection." Id. at 114.

Various parts of the proposal were debated, with particular attention to the amount of time for the repayment of borrowed money. See generally id. at 310-11, 519-22. Ultimately, the twenty-year time period in the draft was expanded to thirty-five years, and the final clause retained the exception in the Rhode Island Constitution of 1842 for times of war, invasion, and insurrection. N.J. Const. of 1844 art. IV, § 6, ¶ 4.

The Legislature invoked the exception on several occasions during the Civil War. See L. 1861 (extra session), c. 8 (authorizing the issuance of up to $2 million in general obligation bonds to pay expenses related to suppressing the rebellion and repelling any invasion); L. 1863, c. 250 (authorizing an additional $1 million in bonds); L. 1864, c. 433 (same).[26]

---

[26] Funds raised were used for "supplies of every kind pertaining to . . . recruiting, subsisting, clothing, arming, equipping, and transporting" troops,

B.

When the 1947 Constitution was adopted, both the Appropriations Clause and the Debt Limitation Clause were expanded.

1.

Dedicated funds and related concerns -- a point of focus and contention at the 1947 Convention -- drove the expansion of the Appropriations Clause.

The 1844 Constitution "deal[t] with state finances in four short paragraphs," leaving "the state fiscal structure . . . almost entirely" to be resolved through legislation. George C. Skillman & Sidney Goldmann, "The Single Budget, Single State Fund and Single Fiscal Year: The Preparation of the Budget as an Executive Function," in 2 1947 Proceedings 1668, 1668. As a result, "[b]eginning with 1923 there had been two fiscal years in state affairs -- the calendar year of the Highway Department and the July 1-June 30 fiscal year of the State Government." Id. at 1670. Eventually, arguments to abolish different fiscal years and dedicated or special funds prevailed, and a single fiscal year and budget were adopted through legislation in 1944 and 1945. See id. at 1671-83.

---

Lewis Perrine, Annual Report of the Quartermaster General for the Year 1862 3 (Jan. 13, 1863); for medical services including opening two hospitals, see id. at 19-23; as well as for payments to "families or dependent widowed mothers" of soldiers totaling nearly $750,000 per year, R.F. Stockton, Jr., Annual Report of the Adjutant General for the Year 1862 16 (Dec. 31, 1862).

At the 1947 Convention, many favored preserving those statutory protections in the Constitution. Abram M. Vermeulen, Supervisor of the Accounting Bureau of the Department of Taxation and Finance, for example, was of the view that the Appropriations Clause of 1844 "does not go far enough." 5 1947 Proceedings 542. He explained that

> [t]here should be a single, all-inclusive budget covering expenditures for all departments. Legislation presently provides for this. This legislation should be protected in the Constitution so that we could never revert to a system such as prevailed before 1944. The State Highway Department formerly operated under a different fiscal year and under a separate budget from the rest of the State.
>
> [Ibid.]

James Kerney, Jr., testified similarly on behalf of the New Jersey Committee for Constitutional Revision. Id. at 646, 649-50.

A. R. Everson, Executive Vice-President of the New Jersey Taxpayers' Association, tied the need to abolish dedicated funds to the fiscal exigencies that accompanied the Great Depression and argued that a single treasury would better enable the State to meet similar fiscal catastrophes in the future:

> One of the most powerful arguments against dedication of funds was provided during the depression when we were faced with the question of utilizing available highway funds to keep the people from starving, or retaining these funds to build roads. . . . In the dreary year of 1932, for example, over $8,000,000 was diverted from the State Highway Fund, the motor

vehicle fuel tax and the motor vehicle license tax, to state unemployment funds to sustain human life.

> From 1931 through 1939, an eight-year period, the State expended for emergency relief over $143,000,000. Of this amount, $31,000,000 came from the State Highway Fund . . . . <u>If we now dedicate highway and kindred funds by constitutional provision, we shall forever seal off this vital source of revenue and foreclose its use for human need should the chaos and disaster of a depression or any other catastrophe come upon us again in New Jersey. . . . You cannot be sure today, when you are writing a Constitution for years to come, that nothing like this will ever happen again.</u>

[<u>Id.</u> at 741, 743 (emphasis added).]

Irene Baldwin, testifying on behalf of the New Jersey League of Women Voters, likewise anticipated that emergency appropriations might be needed when she spoke in "favor of all state monies in a single treasury." <u>Id.</u> at 748.

The Revision Commission of 1941 also supported a single fiscal year and budget, and one general appropriations bill. <u>See</u> <u>Report of the Commission on Revision of the New Jersey Constitution</u>, <u>in</u> 5 <u>1947 Proceedings</u> 827, 827-29. Among other suggestions, the Commission recommended the following expansion to the Appropriations Clause:

> No other bill appropriating public money for any purpose shall be enacted unless it shall (1) provide for some single object or purpose, (2) receive the affirmative votes of two-thirds of the membership of each house of the Legislature, and (3) together with all prior appropriations for the same fiscal period, shall not exceed the total amount of revenue available therefor.

[Id. at 829.]

The Report explained the draft clause would both promote fiscal soundness and allow the State to respond to emergencies that might arise. Id. at 827-28; accord 5 1947 Proceedings 599-601 (testimony of Robert C. Hendrickson, State Treasurer, summarizing the Report).

The Committee on Taxation and Finance proposed an appropriations clause to the Convention on July 30, 1947. It featured a single budget and fiscal period but took a more flexible approach to emergencies than Treasurer Hendrickson and the Revision Commission had recommended. The Committee did not adopt the two-thirds-vote and single-object requirements for supplemental appropriations. Its proposed language instead spoke of reasonable foreseeability and limited the general annual appropriation law and additional appropriations to available and anticipated revenue, rather than available revenue alone. Proposal of the Committee on Taxation and Finance, in 2 1947 Proceedings 1234, 1235.

The Appropriations Clause adopted by the Convention contained the Committee's recommended language with only minor changes. See 2 1947 Proceedings 1241, 1306. The full text of the current clause appears in section VI below.

31

2.

Although the Debt Limitation Clause was the subject of considerable debate in 1844, "[n]o attempt was made to amend [that] provision" until the Commission on Revision's 1942 Report. Tilton, 2 1947 Proceedings at 1715. The Report of the Revision Commission proposed various changes to the clause but recommended retaining "the requirement of a referendum upon all indebtedness exceeding $100,000." 5 1947 Proceedings at 828.

As it did with the Appropriations Clause, the Committee on Taxation and Finance generally took a more flexible approach than the Revision Commission. The Committee proposed the following debt limitation clause to the Convention on July 30, 1947:

> The Legislature shall not, in any manner, create any debt or debts, liability or liabilities, of the State, which shall singly or in the aggregate with any previous debts or liabilities at any time exceed $100,000.00, except for purposes of war, or to repel invasion, or to suppress insurrection, or to meet an emergency caused by act of God or disaster, unless the same shall be authorized by a law for some single object or work, to be distinctly specified therein; which law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal of such debt or liability within thirty-five years from the time of the contracting thereof, and shall be irrepealable until such debt or liability, and the interest thereon, are fully paid and discharged. And no such law shall take effect until it shall, at a general election, have been submitted to the people, and have received the sanction of a majority of

32

all the votes cast for and against it at such election; and all money to be raised by the authority of such law shall be applied only to the specific object stated therein; and to the payment of the debt thereby created. This section shall not be construed to refer to any money that has been, or may be, deposited with this State by the Government of the United States.

[2 1947 Proceedings 1235 (emphases added).][27]

Reporting for the Committee on August 5, 1947, Chairman Read stressed the Committee's determination to remain flexible as to the manner of debt acquired. See 1 1947 Proceedings 149. He also underscored that the Committee expanded the 1844 Clause by adding to its exceptions for war, invasion, and insurrection the phrase,

"or to meet an emergency caused by act of God or disaster," which was practically done in 1932 by the Legislature and looked upon with a great deal of propriety by the people of the State because those things had to be done. Therefore, we placed those words in there.

[Ibid. (emphases added).]

There can be little doubt that the practical enactment Chairman Read referred to was the creation of the State Emergency Relief Administration,

---

[27] The underscored language was also included in the proposed 1944 Constitution, which was defeated at the polls. See Revised Constitution of 1944 art. VII, § 5; accord Tilton, 2 1947 Proceedings 1718-19; see also Robert F. Williams, The New Jersey Constitution 25 (2d ed. 2012).

33

accompanied by an initial appropriation of $8 million, see L. 1931, c. 394,

along with the 1932 authorization of $20 million in bonds "for the relief of the

unemployed and dependents in this State," see L. 1932, c. 251.[28]  Indeed,

"New Jersey's borrowing from 1932 to 1939 was mainly for the purpose of

financing unemployment relief, with one issue in 1933 dedicated to

educational aid."  Tilton, 2 1947 Proceedings 1713.  Because of those efforts,

New Jersey's bonded indebtedness rose and reached a peak in 1935, "when the

State's outstanding obligations totaled $197,000,000."  Ibid.

In response to the hardships of the Great Depression, the Emergency

Relief Administration provided aid through food, shelter, fuel, clothing, health

services, work projects, and support for governing bodies and state agencies.

See State Emergency Relief Administration, Emergency Relief in New Jersey,

October 13, 1931-April 15, 1936:  Final Report to the Governor and to the

Senate and General Assembly (Emergency Relief Final Report) 31-52 (July 31,

1936).  The Administration also provided a diverse array of special programs

including recreation activities, rural rehabilitation, relief gardens, adult

education, student aid, junior college, and vocational rehabilitation, among

---

[28]  There were other relief provisions around the same time as well.  See, e.g.,
L. 1933, c. 398 (additional $5 million "for the relief of the unemployed and
dependents"); L. 1934, c. 255 (additional $10 million); L. 1939, c. 329
(additional $21 million).

others.  Id. at 53-61.  That history informs the meaning of the phrase "meet an emergency caused by disaster," which the Framers added to the 1947 Constitution.

As required under the 1844 Constitution, which did not have an emergency exception, the Depression-relief bond measures identified above were submitted for voter approval at general elections.  At the 1947 Convention, James J. Smith, on behalf of the New Jersey State League of Municipalities, opposed any constitutional provision that would dedicate certain tax revenues to highway funds.  See 5 1947 Proceedings 720.  Beyond that, Smith asserted in his testimony that citizens benefit when the Legislature has the authority to respond to emergencies without the need to amend the Constitution:

> [T]he original dedication of highway funds by the act of 1927 was a legislative enactment.  A Legislature enacts laws to meet current needs.  It developed during the depression years that the social welfare of the citizens of the State required that certain highway funds be diverted for unemployment relief which was more necessary at that time than the extension of our highway system.  It was generally conceded that it was a very wise thing to do, and approximately $65,000,000 was appropriated for relief.
>
> We do not know what lies ahead.  It is quite possible that in the future the people of the State of New Jersey through their legislators would again decide to use highway funds and other funds for urgent needs.  If such an emergency should arise it would be most

> unfortunate for us to find that to meet a pressing need would require an amendment to the State Constitution. Emergencies cannot be met or anticipated by a constitutional provision.

[Id. at 722 (emphases added).]

The revised Debt Limitation Clause the Framers adopted eliminated the need to divert dedicated funds at a time of emergency and also provided the State flexibility to borrow funds for emergencies without waiting for voter approval.

Chairman Read noted that, aside from the Emergency Exception, the Committee's proposed Debt Limitation Clause was "practically the same as the [1844] one." 1 1947 Proceedings 149. A later amendment replaced the $100,000 cap with a one-percent limit. See 2 1947 Proceedings 1240. The full text of the current Debt Limitation Clause appears in section VII below.

## C.

In sum, the history of the fiscal provisions reveals the extent to which they were shaped by the times. The short Appropriations Clause adopted in 1844 generated little discussion or disagreement at that constitutional convention. In 1947, by contrast, considerable debate about the existence of two fiscal years and numerous dedicated funds led to an expanded Appropriations Clause that calls for a single general appropriations act and a balanced budget. And the Debt Limitation Clause, initially adopted in

36

response to financial crises encountered by other states, was made more flexible in 1947 with the shift from a $100,000 to a one-percent cap and the added exception for borrowing "to meet an emergency caused by disaster." The latter change, in particular, reflected the events of the Great Depression experienced in New Jersey and the lessons learned from them.

We turn next to the current version of the two clauses and recent case law that interprets them.

## VI.  Appropriations Clause

The Appropriations Clause calls for "the State's finances [to] be conducted on the basis of a single fiscal year covered by a single balanced budget."  City of Camden v. Byrne, 82 N.J. 133, 151 (1980); see also Burgos, 222 N.J. at 206.  The Clause provides as follows:

> No money shall be drawn from the State treasury but for appropriations made by law.  All moneys for the support of the State government and for all other State purposes as far as can be ascertained or reasonably foreseen, shall be provided for in one general appropriation law covering one and the same fiscal year; except that when a change in the fiscal year is made, necessary provision may be made to effect the transition.  No general appropriation law or other law appropriating money for any State purpose shall be enacted if the appropriation contained therein, together with all prior appropriations made for the same fiscal period, shall exceed the total amount of revenue on hand and anticipated which will be available to meet such appropriations during such fiscal period, as certified by the Governor.

[N.J. Const. art. VIII, § 2, ¶ 2.]

The Clause does not contain an emergency exception.

The Court interpreted the Appropriations Clause in Lance when it considered whether the State could "rely on borrowed funds to balance its annual budget." 180 N.J. at 593. That seminal case involved the FY2005 budget, which relied in part on $1.9 billion in bond proceeds from the Cigarette Tax Securitization Act of 2004, L. 2004, c. 68, and the Motor Vehicle Surcharges Securitization Act of 2004, L. 2004, c. 70. Id. at 594. Proceeds from the bonds went to the General Fund, and the State was obligated by contract to repay those obligations, subject to appropriations from the Legislature. Ibid.

The Court held that proceeds from contract bonds "do not constitute 'revenue' for purposes of . . . the Appropriations Clause[], and cannot be used to balance the annual budget." Id. at 593. As the Court explained, "borrowed monies, which themselves are a form of expenditure when repaid, are not income (i.e., revenues)." Id. at 598. To rely on them to fund general expenses in the ordinary course would "defeat[] the very purpose behind the Appropriations Clause" -- "to bar the State from adopting an annual budget in which expenditures exceed revenues." Id. at 596. The Court referenced

38

several dictionary definitions for "revenue" in reaching that conclusion. Id. at 597-98.

The Court acknowledged its ruling might require a "significant . . . if not . . . complete overhaul of[] the current fiscal year's budget." Id. at 599. Because the "disruption to the State government could be great" and the "legislative and executive branches acted in good faith," the Court applied its holding prospectively. Ibid.

The Court in Lance declined to consider plaintiffs' challenge under the Debt Limitation Clause -- noting the question raised had been resolved in Lonegan v. State (Lonegan II), 176 N.J. 2 (2003) -- and had no other reason to consider that Clause or the Emergency Exception. See 180 N.J. at 593.

VII. Debt Limitation Clause

Article VIII, Section 2, Paragraph 3 of the New Jersey Constitution contains the Debt Limitation Clause. Most relevant for this case, the Clause requires voter approval for the State to incur debts that together exceed one percent of the general appropriation for the fiscal year -- except for debts created "to meet an emergency caused by disaster."

The Clause has five subparagraphs, two of which are central to this case. The core of the Debt Limitation Clause, subparagraph (a), provides as follows:

> The Legislature shall not, in any manner, create in any
> fiscal year a debt or debts, liability or liabilities of the

39

State, which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein. Regardless of any limitation relating to taxation in this Constitution, such law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted; and the law shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged. Except as hereinafter provided, no such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon.

[Id. ¶ 3(a).]

Exceptions to the requirement that debt be approved by the public appear in subparagraph (e):

This paragraph shall not be construed to refer to any money that has been or may be deposited with this State by the government of the United States. Nor shall anything in this paragraph contained apply to the creation of any debts or liabilities for purposes of war, or to repel invasion, or to suppress insurrection or to meet an emergency caused by disaster or act of God.

[Id. ¶ 3(e).][29]

---

[29] The Debt Limitation Clause has been amended twice since 1947. In 1983, an exception to the requirement of voter approval was added for refinancing bonds. See N.J. Const. art. VIII, § 2, ¶ 3 (1984) (now codified at id. ¶ 3(c). In 2009, an amendment requiring voter approval when the State borrows money

The opening reference to "[t]his paragraph" applies to all of paragraph 3 -- the Debt Limitation Clause in its entirety. Thus, the requirements of the Debt Limitation Clause do not apply to the creation of debt "to meet an emergency caused by disaster."

The State Constitution does not define "emergency" or "disaster." The 1931 law that created the State Emergency Relief Administration, however, discussed the meaning of "emergency" as follows: "The hardships occasioned by and attendant upon the lack of gainful employment and the economic depression generally prevailing are so acute and so affect the public health and welfare of the people that there is now an emergency which requires State recognition and aid." L. 1931, c. 394. In his testimony at the 1947 Convention, the Chair of the Committee on Taxation and Finance alluded to the 1931 law. 1 1947 Proceedings 149.

No case law has addressed the meaning of the Emergency Exception or its interplay with the Appropriations Clause. Litigation has instead largely

---

through a state agency or independent authority was ratified. See "Interpretive Statement," Public Question No. 1 (2008), https://www.nj.gov/state/elections/assets/pdf/election-results/2008/2008-official-gen-elect-tallies-public-ques-120208.pdf; see also N.J. Const. art. VIII, § 2, ¶ 3(b). The Clause was broken down into five subparagraphs when the new language was adopted. See N.J. Const. art. VIII, § 2, ¶ 3(a) to (e).

focused on whether "a variety of bonding mechanisms" without voter approval ran afoul of the Debt Limitation Clause. Lonegan I, 174 N.J. at 439 (citing, as examples, Enourato v. N.J. Bldg. Auth., 90 N.J. 396 (1982); N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1 (1972); Holster v. Bd. of Trs. of Passaic Cty. Coll., 59 N.J. 60 (1971); Clayton, 52 N.J. 138; N.J. Tpk. Auth. v. Parsons, 3 N.J. 235 (1949)).

In Lonegan I, the plaintiffs challenged the use of contract debt[30] to fund a large-scale school construction program. By statute, the Economic Development Authority was authorized to issue up to $8.6 billion in bonds for that purpose. Id. at 459. Although the Court restated the principle that contract debt does not implicate the Debt Limitation Clause because "debts of

---

[30] As the Court explained,

> "contract bond" (or "contract debt") describes bonds issued by an independent state authority on a contract between the State Treasurer and the authority stating that payment on the bonds by the State is subject to legislative appropriations. In contrast, general obligation bonds are enforceable state debts backed by the full faith and credit of the State.
>
> [Lonegan I, 174 N.J. at 439 n.1 (citing John Downs & Jordon Elliott Goodman, Barron's Dictionary of Finance and Investment Terms 171 (1991)).]

Contract bonds often have an independent revenue stream to repay the debt, like tolls or payments on a lease. Id. at 445-46.

an independent authority are not debts of the State," see id. at 438, 449-50, 462-63, the Court upheld the statute in light of the State's reliance on Abbott v. Burke, 153 N.J. 480 (1998), and because the act furthered the education provision of the State Constitution, see id. at 441, 462 (citing N.J. Const. art. VIII, § 4, ¶ 1). The Court ordered additional briefing on the broader question whether contract bonds violate the Debt Limitation Clause. Id. at 464-65.

Lonegan II resolved the issue. The Court affirmatively held that "only debt that is legally enforceable against the State is subject to the Debt Limitation Clause." 176 N.J. at 13. Because contract bonds are not backed by the full faith and credit of the State and are subject to future legislative appropriations, they are not legally enforceable against the State and, as a result, do not violate the Debt Limitation Clause. Id. at 14-15, 21.

Neither Lonegan I nor II addressed possible tensions between the Appropriations and Debt Limitation Clauses.

## VIII. Analysis

Against that backdrop, we consider several issues that the Bond Act presents: (1) whether COVID-19 qualifies as a "disaster," and, if so, the nature of the emergency it has caused; (2) what type of borrowing "meet[s] an emergency caused by disaster"; and (3) the interplay between the Emergency Exception and the fiscal clauses of the Constitution.

## A.

To answer those questions, we examine the key components of the language in the Emergency Exception -- "to meet an emergency caused by disaster." N.J. Const. art. VIII, § 2, ¶ 3(e). The phrase has two parts: (1) the emergency must be caused by disaster; and (2) any proposed borrowing must meet the emergency.

As to the first requirement, not every emergency qualifies under the Emergency Exception because not every emergency is "caused by disaster." A heavy snowstorm or ice storm that requires additional snow removal and extra caution on the roadways may lead a governor to declare a temporary state of emergency. The declaration alone, however, would not establish that the emergency was caused by disaster. Nor would the nature of the storm itself in many instances. Likewise, a routine budgetary shortfall might present an emergency, but that does not mean it was necessarily the result of a disaster. And without a "disaster," the Emergency Exception does not apply.

Here, the parties agree that the COVID-19 pandemic is a disaster within the meaning of the exception. Whatever else the Emergency Exception may encompass, it includes a rare, once-in-a-century, infectious disease of the magnitude of COVID-19.

The effects of the pandemic are widespread. As outlined in section II, the disease has taken a toll on human life, on the global and national economies, and on the public fisc in our State. Millions have contracted the virus; hundreds of thousands have died; millions have lost their jobs; and tax revenues here and elsewhere have plummeted. In short, COVID-19 -- an indisputable "disaster" -- has caused a health emergency, a broad-based economic one that has left individuals and families struggling, and a fiscal crisis for the State. The nature of the "emergency" extends to all three.[31]

As to the third area -- the impact on the public fisc -- not only did mass unemployment lead to lower tax revenues, but direct efforts to combat the pandemic have also exacerbated its effect on the State's finances. Shuttering private businesses and ordering individuals to stay at home to fight the disease's spread have contributed to a dramatic drop in revenue from various sources. As a result, the State's ability to provide important public services is at risk.

Any debate over whether the disaster and its effects are foreseen or unforeseen at this point misses the mark. The distinction does not appear in

---

[31] See Jamouneau v. Harner, 16 N.J. 500, 514 (1954) (defining "emergency" in the context of a shortage of rental housing as "an unusual public exigency calling for the exercise of the police power to alleviate the common peril or need").

45

the text of the Emergency Exception and is illogical when it comes to a continuing emergency. Today, unlike in February, we know that each week ahead will bring more cases and more deaths. Just because one can foresee the continuation of an emergency does not make it any less of one. See Worthington v. Fauver, 88 N.J. 183, 195 (1982) (noting that, in the context of the Disaster Control Act, "it is not a necessary component of an 'emergency' that it be sudden or unforeseen").

B.

The second component of the Emergency Exception -- that borrowing must "meet an emergency" -- begs the question as to what type of borrowing is permitted.

"Meet" is not a precise term. It is also not a limiting term in everyday use. Among other definitions, Webster's Dictionary defines "meet" as "to contend successfully with" -- for example, to meet a problem -- and "to provide for" -- for example, "public and private agencies labored to meet a critical housing shortage." Webster's Third New International Dictionary (Unabridged) 1404 (1981).

The State aptly points out that the term "meet" also appears in the Appropriations Clause where it means, in essence, "to match fully." The Clause requires that the State have enough revenue on hand to "meet"

46

expenditures.  N.J. Const. art. VIII, § 2, ¶ 2.  There is no "clear indication" why the term should not "have the same meaning throughout" the fiscal clauses.  See L.A., 217 N.J. at 333.

At a minimum, then, incurring debt to meet an emergency caused by disaster means that borrowing must relate to or provide for that emergency. We interpret the stated purpose of the Bond Act with that in mind.  To reiterate, it authorizes borrowing "[1] to respond to the fiscal exigencies caused by the COVID-19 Pandemic and [2] to maintain and preserve the fiscal integrity of the State."  Bond Act, § 2(ll).  We do not read those phrases as separate, stand-alone justifications for borrowing under the Emergency Exception.  If borrowing were done solely to maintain the State's fiscal integrity, untethered to the effects of the pandemic, it would not satisfy the exception.  Both clauses must relate to the effects of COVID-19.

In this case, borrowing "to meet an emergency" raises two issues:  the type of borrowing and spending, and the overall amount of borrowing.

1.

As described in section V, the Framers were influenced by the experience of the Great Depression when they drafted the Emergency Exception.  To repeat, during the 1947 Constitutional Convention, the chair of the Committee on Taxation and Finance referred to what "was practically done

47

in 1932 by the Legislature," in response to the Great Depression, to justify an expanded exception to the Debt Limitation Clause "to meet an emergency." 1 1947 Proceedings 149. The State's prior efforts in that regard included a wide array of borrowing and spending to meet the crisis at hand, including direct aid in the form of food, shelter, and health care, and also recreation activities, adult education, vocational rehabilitation, and then some. Emergency Relief Final Report 31-61.

Here, borrowing may be allowed to meet all three aspects of the current emergency. In practical terms, debt can be incurred to provide not only for masks, respirators, and field hospitals, and for direct aid to individuals and families afflicted by the disease, but also for the impact on the public fisc caused by COVID-19. As to the latter category, the State, for example, may borrow to provide for public services like education, police, fire, first aid, child welfare, and prisons, among other services -- to secure the continued functioning of government. In other words, because the collapse in revenue brought on by the pandemic affects the State's ability to provide for direct aid and other government services, the Emergency Exception permits the State to borrow in order to meet them.

That said, not every act of borrowing would "meet" the current emergency. Borrowing for programs unrelated to the emergency would not

48

satisfy the language of the exception or the Act.  For example, using $1 billion in borrowed funds to subsidize a new sports arena could hardly be said "to respond to the fiscal exigencies caused by the COVID-19 Pandemic" or "preserve" the State's "fiscal integrity."  Bond Act, § 2(ll).  To incur debt for such a project would require additional legislation that might well need voter approval.

The above examples are illustrative only.  It is not for the courts to decide which projects best respond to the pandemic, or to get drawn into a debate about them.  Reasonable people may differ about how to meet the challenges society now faces.  Those questions "are for the Legislature and the people to decide, subject only to constitutional bounds."  N.J. Ass'n on Corr. v. Lan, 80 N.J. 199, 211 (1979).  Courts traditionally defer to the will of the Legislature and the choices it makes, provided they do not run afoul of the Constitution.  See McCrane, 61 N.J. at 8; Roe v. Kervick, 42 N.J. 191, 229 (1964).[32]

A more restrictive view would reason that because a multi-billion dollar shortfall in revenue on account of the pandemic is predictable today -- in a way

_____

[32] Lan, 80 N.J. at 212-20, and Behnke, 13 N.J. at 32, provide examples of legislative deference related to the "single object or work" requirement of the Debt Limitation Clause.

that was not foreseeable one year ago -- the State cannot borrow to cover any of that shortfall other than costs tied directly to health aspects of the pandemic, such as respirators and field hospitals. Such an approach would not "meet" the devastation caused by a broad-based emergency like the COVID-19 pandemic or the Great Depression. Nor does that approach find support in the words of the Constitution, which does not limit borrowing in such a stringent way at a time of a continuing emergency caused by disaster.

2.

Because of how the Bond Act was drafted, this case presents an additional issue: whether the <u>overall</u> amount of borrowing meets the current emergency. Certain laws enacted during the Great Depression authorized borrowing of amounts ranging from $5 million to $20 million "for the relief of the unemployed and dependents in this State." <u>See, e.g.</u>, <u>L.</u> 1932, <u>c.</u> 251; <u>L.</u> 1933, <u>c.</u> 398; <u>L.</u> 1934, <u>c.</u> 255. Unlike those statutes, the Bond Act uses general language. Once again, the stated purpose of the borrowing is "to respond to the fiscal exigencies caused by the COVID-19 Pandemic and to maintain and preserve the fiscal integrity of the State." Bond Act, § 2(ll).

That language calls into question the total amount of borrowing allowed under the Emergency Exception. Simply put, because the proposed borrowing is keyed to the fiscal exigency caused by COVID-19 -- that is, the revenue

50

shortfall the pandemic has caused through the end of FY2021 -- whether the borrowing meets the emergency depends on what the exigency or shortfall actually is.

The Act caps the total amount of borrowing at $9.9 billion.  That amount matches the projected revenue shortfall the State Treasurer reported on May 22, 2020.  The Legislature relied on the best available evidence at the time it held hearings in early June.  By the end of June, improved estimates reduced the projected shortfall by $700 million -- to $9.2 billion.[33]  The trend through July also suggested higher overall revenue than predicted, which would mean the State's shortfall was even less.  And as the Treasurer noted on July 31, 2020 in her certification to the Court, the "forecast will most certainly change in the coming weeks and months."

To avoid borrowing in excess of what the law allows, and to be faithful to the Emergency Exception, the State cannot issue bonds or borrow funds beyond the actual fiscal exigency caused by the pandemic.  In order to satisfy those concerns, it will be necessary for the Governor or the Treasurer to certify

---

[33]  Citations for this paragraph appear in section II.A.

publicly the State's projected revenue and consequent shortfall "as a result of the COVID-19 pandemic" before each tranche of borrowing.[34]

What this means in practice is that, even though the Bond Act allows for borrowing of up to $9.9 billion, if the Governor or the Treasurer were to certify that the fiscal shortfall due to COVID-19 was $7 billion, then the State could borrow only up to that amount at the time.[35] Based on the Treasurer's July 31, 2020 certification to the Court, which projected a shortfall of $9.2 billion as a result of the pandemic, the State could have borrowed only up to that amount had it been able to borrow funds or issue bonds that day.

Changes in revenue projections may head in the opposite direction as well, and may support a higher level of borrowing to meet the fiscal exigency caused by the pandemic than current projections do. In no event, however, can borrowing exceed $9.9 billion under the Act.

Once again, the Bond Act's generic language, which is linked to the State's fiscal shortfall, calls for this added level of protection. Had the Act instead specified particular efforts to meet the emergency -- for example, the

---

[34] The quoted language matches the Treasurer's certification to the Court. See, e.g., Muoio Cert. ¶¶ 74-75.

[35] We use an aggregate figure for simplicity. Projections and certifications would necessarily address FY2020 and FY2021, respectively, as the Treasurer has done to date.

52

borrowing of a specific sum for direct relief to the unemployed -- there would be no need for the additional periodic certifications by the Governor or the Treasurer that we require.

We encourage greater specificity for laws issued under the Emergency Exception and for how borrowed money will be spent.

C.

We next consider how the Emergency Exception relates to the fiscal clauses of the Constitution.

The Emergency Exception appears only in the Debt Limitation Clause, not the Appropriations Clause. That distinction is the basis for plaintiffs' argument that the exception applies only to the act of borrowing but not to the appropriations process.

At oral argument, counsel for amici Ciattarelli and Webber thoughtfully acknowledged that the Appropriations Clause does not stand in the way of borrowing for appropriate purposes under the Emergency Exception.[36] We agree. A contrary reading would lead to a situation in which the State could borrow funds to meet an emergency but not be able to spend them. Also, an overly literal reading could result in the State being able to borrow more

---

[36] We recognize that amici have a different view of the type of borrowing considered appropriate.

53

modest amounts of money to meet the needs of a relatively limited crisis --

which ultimately might not throw revenues and expenses out of balance, given

the size of the overall State budget -- yet not be able to borrow far larger

amounts in times of great crisis, when it would simply not be possible to

balance revenues and expenses.

Such a reading would be flawed for a number of reasons.  First, it leads

to absurd results like the ones noted above, and courts must avoid interpreting

the Constitution and statutes in a way that creates absurd outcomes.  See Sun

Life, 238 N.J. at 174 n.3; Perez, 218 N.J. at 214.  Second, such a reading of the

fiscal clauses would also render the Emergency Exception meaningless when it

is needed the most.  Courts avoid interpretations that render language in the

Constitution superfluous.  Burgos, 222 N.J. at 203.  Third, such a reading is

not what the Framers intended.

We consider the Emergency Exception in light of the language and

purpose of the fiscal clauses of the Constitution, considered as a whole, and

the Framers' intent in drafting them.  By doing so, we give effect fully and

fairly to the overriding purpose of the fiscal clauses.  See Lance, 180 N.J. at

596; Trump Hotels, 160 N.J. at 527; see also Behnke, 13 N.J. at 26 ("The true

rule of construction 'is not to consider one provision of the Constitution alone,

but to contemplate all.'"  (quoting Downes, 182 U.S. at 312)).

As discussed previously, the history of the 1947 Constitutional Convention revealed the Framers had dual concerns: to impose discipline on the State's fiscal practices and, at the same time, provide flexibility to respond to emergencies caused by disaster. To achieve those ends, the Constitution calls for a single fiscal year and an annual balanced budget, and it imposes certain limitations on incurring debt. Yet the Framers also added an exception to empower the State to respond quickly and effectively in times of true disaster and emergency. They did so against the backdrop of the Great Depression and the crises that befell our State during that time. In fact, debate at the Convention reveals the Framers were thinking of large-scale relief efforts in the face of great calamity when they added the Emergency Exception to the Constitution. "The history of the times renders evident the purpose" underlying the fiscal clauses. See Clayton, 52 N.J. at 146.

We are reminded that "[t]he polestar of constitutional construction is always the intent and purpose" of the language of the Constitution. Apportionment Comm'n, 125 N.J. at 382. The Framers did not intend for the Appropriations Clause to bar what the Debt Limitation Clause allows; their purpose was to enable the government to act to "meet an emergency caused by disaster." Read in tandem, and in light of the Framers' intent, the fiscal

55

clauses allow the State to borrow and spend for that particular purpose and do not pose a bar to the Bond Act.

To be clear, we do not overrule the holding in Lance. Lance concluded that proceeds from contract bonds "do not constitute 'revenue' for the purposes of . . . the Appropriations Clause[], and cannot be used to balance the budget." 180 N.J. at 593. That remains the law. Lance, however, did not consider the Debt Limitation Clause, the Emergency Exception, or their interplay with the Appropriations Clause.[37]

## IX. Conclusion

Statutes challenged on constitutional grounds can be declared void only if their "repugnancy to the constitution is clear beyond reasonable doubt." Buckner, 223 N.J. at 14. Plaintiffs have not met that heavy burden. We

---

[37] In light of our analysis, we need not consider a number of arguments the parties have raised. Because the Emergency Exception to the Debt Limitation Clause applies here, the Clause's single-object requirement, like its requirement of voter approval, does not apply. See N.J. Const. art. VIII, § 2, ¶ 3(a). We do not rely on the federal funds exception in the first sentence of N.J. Const. art. VIII, § 2, ¶ 3(e), and therefore do not need to interpret its scope. Nor do we address the refinancing or refunding of bonds, an issue raised by amici. See ibid. ¶ 3(c); State in Interest of A.A., 240 N.J. 341, 359 n.1 (2020); Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n, 91 N.J. 38, 48-49 (1982). Finally, we decline to consider plaintiffs' separation of powers argument, raised for the first time in their reply brief. See State v. Smith, 55 N.J. 476, 488 (1970); L.J. Zucca v. Allen Bros. Wholesale Distribs., Inc., 434 N.J. Super. 60, 87 (App. Div. 2014).

therefore conclude that the Bond Act is constitutional, subject to the limiting principles set forth above.


JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in CHIEF JUSTICE RABNER's opinion.